THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 09-3599 (JBS/KMW) |
| v. | : | |
| BRIAN KEARNS and BRUCE J. VAN FOSSEN, | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

John J. Bowers, Esq.
Paul Kisslinger, Esq.
Sharon Custer, Esq.
U.S. SECURITIES & EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
    Counsel for Plaintiff the United States Securities and
    Exchange Commission

Edward Shapiro, Esq.
Larisa V.K. Gjivoje, Esq.
Christopher Turner, Esq.
LATHAM & WATKINS, LLP
One Newark Center, 16th Floor
Newark, NJ 07101-3174
    Counsel for Defendant Brian Kearns

**SIMANDLE**, District Judge:

This action is presently before the Court a motion to

dismiss by Defendants Brian J. Kearns [Docket Item 15].[1]  In

---

[1] Defendant Bruce J. Van Fossen similarly filed a motion to
dismiss [Docket Item 16] along with a motion to seal pursuant to
Local Civil Rule 5.3 [Docket Item 19].  Defendant Van Fossen has
since settled this matter with Plaintiff [Docket Items 43 & 44].
The Court will consequently order the Clerk of Court to terminate
these two motions and to remove the sealed documents [Docket

response to this securities fraud action brought by the United
States Securities and Exchange Commission ("SEC"), Defendant
Kearns argues that the complaint is untimely and that the SEC
fails to state a claim for securities fraud.  The Court, for the
reasons expressed below, finds that this action was timely
commenced and it will deny Defendant's motion to dismiss, except
as to any claims arising out of the statements constituting mere
"puffery" made during the quarterly meetings and again in various
Forms 8-K, because these statements are not actionable
misrepresentations under the securities statutes.

**I.    BACKGROUND**

    **A.    Factual Allegations**

        1.    <u>MedQuist Billing Scheme</u>

Underlying this action is an alleged fraudulent scheme by
Medquist Inc., a medical transcription company based in New
Jersey, to improve financial performance by "systematically and
secretly inflat[ing] its bills to customers in order to increase
revenues and profit margins" from 1999 to 2004.  (Compl. ¶ 1.)
According to the complaint, MedQuist took advantage of the opaque
quality of the billing arrangements in many of its customer
contracts, in which the bill was to be calculated by using a unit
of measure called an "AAMT line."  (<u>Id.</u> ¶¶ 9-10.)  The AAMT line
was any line of 65 "characters," with characters being functions

_____

Items 17 & 18] from the docket.

that were not all visible to a reviewer, so that it was
impossible for clients to confirm that they had been correctly
billed.  (Id. ¶¶ 10-13.)  Beginning in 1999, MedQuist began to
deviate from the billing method outlined in many contracts, first
by ceasing to actually count AAMT lines, but instead calculating
AAMT lines by simply multiplying the payroll line count (the
measure MedQuist used to pay transcriptionists and not equal to
the AAMT line) by two.  (Id. ¶¶ 13-16.)  This policy was known at
MedQuist as "2-to-1 ratio" or the "2-to-1 Bill to Pay [BFP]"
ratio.  (Id. ¶ 16.)  MedQuist adopted a second billing policy, in
which clients were billed $3 for every $1 paid to a
transcriptionist, known as the "3-to-1 ratio."  (Id. ¶ 18.)

    "MedQuist continued to secretly adjust line count ratios
until 2004 or later," using an internal unit called the Financial
Operational Audit ("FOPA") to implement the billing scheme.  (Id.
¶ 20.)  The FOPA prepared reports that documented the billing
strategies and recommended "secretly or gradually" increasing
line count ratios and creating AAMT accounts to allow for
manipulative billing practices.  (Id.)  In order to disguise
these artificial billing increases, MedQuist would sometimes time
the increases to period of heavy work volume, so that the
increases would go unnoticed.  (Id. ¶ 22.)

2.   Defendant Kearns' Knowledge and Participation in MedQuist's Billing Scheme

The SEC alleges that Defendant Kearns, Treasurer and Chief Financial Officer ("CFO") of MedQuist from October 2000 through July 2004, "knew about this billing scheme and, instead of stopping the fraud, took steps to further and conceal the scheme."  (Id. ¶¶ 2, 7-8.)

On October 16, 2000, Defendant Kearns joined MedQuist as its Treasurer and CFO, and on October 18, 2000, Defendant Kearns attended a meeting during which the Chief Operating Officer ("COO") "discussed MedQuist's 2-to-1 BTP ratio and the 3-to-1 gross margin policies."  (Compl. ¶ 31.)  Defendant Kearns' discussions with the COO continued, as did similar discussions with the director of the FOPA, until early 2002, and included talk of "the revenue and gross margin targets established by the 3-to-1 margin ratio policy," the lack of uniformity in application of the 2-to-1 BTP ratio, and the content of FOPA reports.  (Id. ¶¶ 32, 34.)  In addition, the FOPA director and Defendant Kearns "discussed [MedQuist's] adjustments to ratios to increase line counts and revenue."  (Id. ¶ 34.)  During this period Defendant Kearns also received reports and emails from FOPA that recommended gradually and secretly increasing the line count ratios to increase profits.  (Id. ¶¶ 35-37.)  From October 2000 through 2001, Defendant Kearns discussed with Defendant Van Fossen, MedQuist's Controller, "the 2-to-1 BTP ratio policy and

4

the use of ratios instead of counting AAMT lines" and both regularly saw "management reports that presented customer billed AAMT line totals in terms of ratios rather than counts."  (<u>Id.</u> ¶ 33.)

>    3.  <u>Defendant Kearns' Failure to Respond to Employee and Customer Complaints Regarding Fraudulent Billing Practices</u>

In February 2003, Defendant Kearns, along with Van Fossen, learned of another employee complaint regarding secret billing adjustments ("I [] was encouraged to and I quote 'play the game' and <<overcharge>> there [sic] clients.  I was told that 'everyone else does it' . . .") in the Pennsylvania office. (Compl. ¶ 51.)  Kearns and Van Fossen directed a review of the office, but the review was ineffective because it did not examine line count accuracy or arrange for audit trails, even though the employee performing the review told Defendant Kearns "that a January 2002 internal FOPA review of the Pennsylvania office had recommended secret changes to line count ratios to increase revenue and profit margins and that line count ratios at that office had in fact been increased without any audit trails or documentary support." (Compl. ¶¶ 51-54.)  Van Fossen saw that of all the line ratios at the Pennsylvania office, approximately 37% of customers had ratios higher than 2 to 1.  (<u>Id.</u> ¶ 53.) Nevertheless, on February 21, 2003, Defendant Kearns told the Audit Committee of MedQuist's Board of Directors and the external

auditors that the review of the Pennsylvania office did not show any billing irregularities.  (Id. ¶ 55.)

Again, in March 2003, Kearns learned of an employee complaint about "suspicious billing" in the Ohio MedQuist office. (Id. ¶ 56.)  An FOPA report, dated April 3, 2004, stated that the office "routinely changed line count ratios after contracts were in place" to manipulate profit margins and found "multiple control weaknesses, including no record of ratio changes."  (Id.) Van Fossen received a copy of this report and Kearns knew of its content.  (Id.)

On September 10, 2001, Kearns received a report from a senior staff meeting detailing why customers had left MedQuist for other services.  (Compl. ¶ 44; Van Fossen Exh. J.)  Sixteen former customers gave reasons for leaving and of those, nine[2] complained of a lack of transparency in billing or a billing problem, noting "fraudulent billing practices," "no verification of lines billing; could not justify bills," "could not justify billing," "concerned with inability to reconcile line counts," "pricing and billing issues," "unable to reconcile billing . . . no satisfactory explanation of invoices," "Service and Billing

---

[2] The complaint alleges ten customers with billing complaints.  On reviewing the report, the Court could find only nine billing-related complaints (not including those who left MedQuist simply for a lower price elsewhere).  See ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control.").

Dispute . . . could not discuss in detail due to pending lawsuit," "billing issues; no justification," and "line counts never matched . . . never a clear explanation of our invoices." (Van Fossen Exh. J.)  In March 2002, the COO informed Defendant Kearns that employees were "jockeying [] the bill-to-pay ratio's [sic] to appease customers - only to have [MedQuist] lose the customer eventually anyway."  (Compl. ¶ 45; Van Fossen Exh. E.) Finally, that same month, MedQuist's General Counsel told Kearns "that another AAMT line customer had sued MedQuist for $200,000 alleging fraudulent overbilling."  (Compl. ¶ 46.)

      4.  <u>Omissions and Misrepresentations to Auditors</u>

The SEC alleges that from October 2000 to 2004, despite his duty to MedQuist shareholders to ensure the accuracy and integrity of the company's billing and financial reporting, Defendant Kearns did not inform auditors that MedQuist no longer counted AAMT characters, had inadequate controls on its billing process, manipulated line count ratios to increase revenue, was subject to employee and customer complaints of billing fraud. (<u>Id.</u> ¶¶ 62-66.)  Kearns did not reveal this material information to auditors, even though he knew these facts or was reckless in not knowing.  (<u>Id.</u>)

During the 2002 annual audit, Defendant Kearns permitted a subordinate to give auditors a fabricated document, though Kearns knew it was fabricated, that was designed to convince auditors that MedQuist calculated AAMT lines by counting characters,

rather than by using ratios. (Id. ¶ 68.) Kearns knew or was reckless in not knowing that the fabricated document was misleading because it represented a billing method that was not in use. (Id.)

Until the third quarter of 2003, Defendant Kearns signed representation letters to external auditors that falsely stated that he had provided all relevant information to auditors, that he knew of no false statements to auditors, that he knew of no internal control deficiencies, and he knew of no allegations of fraud by employees or others. (Id. ¶ 69.)

As previously noted, on February 21, 2003, Defendant Kearns told the external auditors that the internal review of the Pennsylvania office showed no billing irregularities, without revealing that the office made undocumented increases to line count ratios and lacked audit trails. (Id. ¶ 70.) In December 2003, the external auditors asked MedQuist management for information regarding a vice president's allegations of fraudulent billing practices. (Id. ¶ 71.) From December 2003 "through about March 2004," Defendant Kearns was the principal source of information to the auditors. (Id.) During this period, Defendant Kearns told external auditors that MedQuist had done nothing wrong and that the line counts were legitimate, even though he knew that MedQuist was engaged in the above-described billing scheme. (Id.)

    5.   <u>Omissions and Misrepresentations to Shareholders and the Public</u>

According to the complaint, Defendant Kearns failed to disclose information that an investor would consider important to his investment decisions with MedQuist, including that the company was no longer counting AAMT lines as required by company contracts, that it had inadequate controls on its billing process, that it had received complaints of billing fraud, and MedQuist's improving financial performance was due in part to manipulation of line count ratios.  (<u>Id.</u> ¶ 72.)  Defendant Kearns reviewed and signed all financial documents, including the Management and Discussion Analyis ("MD&A") sections of the Forms 10-K and 10-Q, which represented that MedQuist's revenue was "based primarily on contracted rates" and that its improved financial performance was due to legitimate business practices such as increased sales to existing and new customers, acquisitions, or growth in its transcription business generally. (<u>Id.</u> ¶¶ 73-74.)  These misrepresentations were incorporated into forms Forms S-8, S-3, and S-3A, prepared by Van Fossen and signed by Kearns.  (<u>Id.</u> ¶ 75.)  The last of these public statements and reports was filed on November 12, 2003.[3]  (Kearns Exh. A at 2.)

---

[3] The complaint speaks generally of filings "to 2004," but Defendant Kearns submits MedQuist's Form 10-K for the fiscal year 2005, which states that MedQuist filed its last periodic report on November 12, 2003.  (Kearns Exh. A at 2.)  While the complaint does not expressly rely on this Form 10-K, the Third Circuit permits courts "to take judicial notice of properly-authenticated public disclosure documents filed with the SEC" even on a motion

Defendant Kearns participated in quarterly investor conference calls from the third quarter of 2000 through the second quarter of 2002, in which MedQuist attributed revenue growth to "back to basics management discipline," "disciplined business practice," and the experience and discipline of its management team, without revealing that increased revenues were due in part to manipulation of billed line counts. (Id. ¶ 76-77.) Defendant Van Fossen then incorporated the scripts of these calls into MedQuist's Forms 8-K and Defendant Kearns signed those forms. (Id.)

### 6. The Billing Scheme is Revealed to the Public

On December 12, 2002, a MedQuist vice president complained that she "and other MedQuist employees have been asked to impose general bill increase to clients as a way of increasing MedQuist's revenue without any basis in the underlying client contracts." (Id. ¶ 48.) Soon after, Defendants Kearns learned of the complaint and conducted a review, but did not examine the accuracy of the line counts or the validity of the line count ratios. (Id. ¶ 49.) Due to her concerns regarding billing practices and MedQuist's failure to properly respond, the vice president refused to sign internal certifications for the fourth quarter of 2002 and the first two quarters of 2003. (Id. ¶ 50.)

---

to dismiss. Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000). The SEC does not challenge the authenticity of this document and the Court will consider it.

In November 2003, MedQuist ordered the vice president to sign internal certifications with her written exceptions.  (Id. ¶ 59.) In a letter dated November 12, 2003, the vice present explained that "she refused to certify that she knew of no instances of fraud, no violations of law and regulations, no false statements, no material adverse effects on financials, and no violations of contractual agreements" and she reiterated her concerns from December 12, 2002. (Id. ¶ 59.)

On November 12, 2003, MedQuist auditors refused to sign off on the company's financial statements as a result of an employee complaint regarding billing practices.  (Id. ¶ 23.)  During the subsequent investigation, as previously noted, Defendant Kearns told external auditors that MedQuist had done nothing wrong and that the line counts were legitimate, even though he knew that MedQuist was engaged in the above-described billing scheme.  (Id. ¶ 71.)  The first public disclosure of any wrongdoing came on March 16, 2004, when MedQuist disclosed that due to an employee's "assertions of potential improper billing practices" the company had delayed filing its Form 10K for 2003 pending an investigation.  (Id.)  MedQuist did not publicly acknowledge its admission that improper billing practices had occurred until July 30, 2004.  In press releases on July 30 and August 3, 2004, MedQuist disclosed its secret billing methods used to increase profits.  (Id.)

7.   <u>Claims for Relief and Requested Remedies</u>

Based on the above allegations, the SEC asserts that Defendant Kearns is liable for violating the following provisions:

| Count One | Antifraud Provisions in Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] |
|---|---|
| Count Two | Antifraud Provisions in Section 10(b) of Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] |
| Count Four | Prohibition on False Records and False Statements in Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2] |
| Count Five | Aiding and Abetting Violations of Reporting Provisions in Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.20, .13a-1, .13a-11, and .13a-13] |
| Count Six | Aiding and Abetting Violations of Books and Records and Internal Control Provisions in Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(a), (b)(2)(B)] |

The SEC asks for relief in the form of civil money penalties, an order prohibiting Defendant Kearns from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act or that is required to file reports by Section 15(d) of the Exchange Act, and finally an order enjoining Defendant Kearns from further violations of securities laws.

12

**B.    Procedural History**

On March 12, 2009, the SEC filed this action in the United States District Court for Southern District of New York.  On July 14, 2009, Judge Cote granted Defendants' motion to transfer to the District of New Jersey, Camden vicinage.  Both Defendants filed motions to dismiss, but, as discussed above, Plaintiff has settled its claims with Defendant Van Fossen and so Kearns remains the only defendant.  On February 16, 2010, the Court heard oral argument on Defendant Kearns' motion to dismiss and reserved decision.

## II.  DISCUSSION

**A.    Standard of Review and Pleading Standards**

In its review of Defendant Kearns' motions to dismiss, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). Thus, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009); Fowler v. UPMC Shadyside,

578 F.3d 203, 210 (3d Cir. 2009).[4]

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

> Therefore, after Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [Iqbal, 129 S.Ct. at 1950.]  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." Id. [] In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.  See Phillips, 515 F.3d at 234-35.

Fowler, 578 F.3d at 210-11.

"In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citation omitted).

---

[4] The SEC's reliance on the "no set of facts" standard in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), is misplaced because the Supreme Court expressly rejected this standard in Twombly, 550 U.S. at 560-63.

Finally, because this securities claim asserts fraud, the SEC must meet the heightened pleading standard of Rule 9(b), Fed. R. Civ. P., which requires that the SEC "state with particularity the circumstances constituting fraud or mistake." In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1417-18 (3d Cir. 1997) (Rule 9(b) applicable to securities fraud claims). This requirement is intended "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum, 361 F.3d at 223-24 (internal citation omitted). "Plaintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Id. at 224 (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984)). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally."[5] Fed. R. Civ. P. 9(b).

---

[5] While the Private Securities Litigation Reform Act ("PSLRA") requires private plaintiffs in securities fraud actions to plead scienter with particularity, the SEC is not subject to the PSLRA and need not plead scienter with particularity. See Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009) (noting the distinction between Rule 9(b) and the PSLRA on pleading scienter).

**B.    Statute of Limitations**

1.    <u>Applicable Statute of Limitations</u>

The parties agree that, at least as to the SEC's request for civil monetary penalties, the five-year limitations period in 28 U.S.C. § 2462 applies.  Section 2462 provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

It is undisputed that the Exchange Act and the Securities Act, as well as the related federal regulations, do not contain limitation periods, and further that the monetary penalties sought fall within the scope of § 2462.  <u>See</u> <u>Zacharias v. SEC</u>, 569 F.3d 458, 471 (D.C. Cir. 2009) (§ 2462 applicable to civil penalty suits brought by SEC); <u>SEC v. Koenig</u>, 557 F.3d 736, 739 (7th Cir. 2009) (same); <u>SEC v. Mohn</u>, 465 F.3d 647, 653 (6th Cir. 2006) (§ 2462 applicable to SEC action to enforce administratively assessed penalties); <u>SEC v. Montle</u>, 65 F. App'x 749, 753 (2d Cir. 2003) (declining to decide whether § 2462 applies only to penal remedies);  <u>SEC v. U.S. Funding Corp.</u>, No. 02-2089, 2006 WL 995499, at *8 (D.N.J. Apr. 11, 2006); <u>see also</u> <u>United States v. Meyer</u>, 808 F.2d 912, 913-14 (1st Cir. 1987) (§

2462 applicable to government civil enforcement proceedings).[6]

The dispute regarding the applicable limitations period (or absence of any limitations period) focuses on whether the equitable relief sought by the SEC -- namely, an injunction preventing Defendant Kearns from ever acting as an officer or director of any issuer of certain classes of securities and enjoining him from further violations of securities laws -- constitute a "penalty" under § 2462, such that the five year period applies to the entire action.  The Court need not address this dispute because, as the Court will explain below, the SEC's claims are timely even if they all fall within the scope of § 2462.

---

[6] Two circuits have published opinions which suggest that no statute of limitations applies to civil enforcement actions brought by the SEC.  See SEC v. Calvo, 378 F.3d 1211 (11th Cir. 2004); SEC v. Diversified Corp. Consulting Group, 378 F.3d 1219 (11th Cir. 2004); SEC v. Rind, 991 F.2d 1486 (9th Cir. 1993). Strikingly, none of these opinions address the plain (and mandatory) language of § 2462 or the meaning of "penalty."  See SEC v. Berry, 580 F. Supp. 2d 911, 919 (N.D. Cal. 2008) (noting that Rind makes no mention of § 2462 and "penalty" - or what to do if equitable relief is also a penalty); SEC v. Kirkland, 521 F. Supp. 2d 1281, 1306 (M.D. Fla. 2007) (noting contrast between § 2462 and language in Calvo and Diversified).  Further, the Eleventh Circuit has subsequently adopted the reasoning in Johnson v. SEC, 87 F.3d 484 (D.C. Cir. 1996), which applied the five year limitations period in § 2462 to an SEC action for not only civil penalties but equitable relief.  Coghlan v. Nat'l Transp. Safety Bd., 470 F.3d 1300, 1305-06 (11th Cir. 2006).  It appears that the SEC is not disputing the applicability of § 2462 to its request for civil penalties, citing Calvo only to support its argument that "no statute of limitations applies to the SEC's claims for equitable relief."  (Pl. Kearns Opp'n at 33.)

2.   <u>Accrual and Equitable Tolling</u>

The Court has found that the five-year limitation period of § 2462 applies to the SEC's claims for civil penalties (at the very least) and consequently must next determine at what point to begin counting the five years.  The parties engage in what amounts, in these circumstances, to a pedantic exchange over whether in cases of fraud a claim accrues at the time of the violation but can be tolled under the doctrine of fraudulent concealment, or if the doctrine of inherent fraudulent concealment arising from the Supreme Court's decisions in <u>Bailey v. Glover</u>, 88 U.S. 342, 349 (1874) and <u>Holmberg v. Armbrecht</u>, 327 U.S. 392, 397 (1946) imposes the "discovery rule" of accrual for all claims sounding in fraud.  Defendant Kearns maintains that § 2462 always accrues with the alleged violation and that Plaintiff cannot establish equitable tolling because it alleges no affirmative acts of concealment separate from the alleged fraud after November, 2003.  Plaintiff responds that under <u>Holmberg</u> and <u>Bailey</u> the statutory period does not begin until the SEC discovered the violations because the allegations sound in fraud. The Court finds that, regardless of whether the term accrual or tolling is applied, the SEC is entitled to protection under <u>Bailey</u>.[7]

---

[7] While there is a line of jurisprudence in this circuit regarding the federal "discovery rule," the Court finds it somewhat unhelpful in these circumstances, because the Third Circuit will "utilize the federal 'discovery rule' when there is

The principle set forth in <u>Bailey</u> and its progeny is best summarized in the Supreme Court's later decision in <u>Holmberg</u>:

> [T]his Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.' <u>Bailey v. Glover</u>, 21 Wall. 342, 348, 22 L.Ed. 636; and <u>see</u> <u>Exploration Co. v. United States</u>, 247 U.S. 435, 38 S. Ct. 571, 62 L. Ed. 1200; <u>Sherwood v. Sutton</u>, Fed. Cas. No.12, 782, 5 Mason 143.
>
> This equitable doctrine is read into every federal statute of limitation.

327 U.S. at 396. Consequently, the Third Circuit when applying the <u>Holmberg</u> doctrine to a Pennsylvania statute of limitations distinguished between "inherent fraud, which is considered 'self-concealing by its nature,'" and the "alternative doctrine of 'fraudulent concealment'" which is applied "[i]rrespective of any inherent fraud" and requires the plaintiff to show "an affirmative and independent act of concealment that would divert or mislead a plaintiff about the underlying cause of action." <u>Sheet Metal Workers, Local 19 v. 2300 Group, Inc.</u>, 949 F.2d 1274,

---

no controlling federal statute." <u>Miller v. Fortis Benefits Ins. Co.</u>, 475 F.3d 516, 520 (3d Cir. 2007) (citing <u>Romero v. Allstate Corp.</u>, 404 F.3d 212, 222 (3d Cir. 2005)). In the present case, there is a controlling federal statute of limitations. The question of when a § 2462 claim accrues is therefore not decided by this line of cases, though the federal discovery rule indicates a preference for protecting federal plaintiffs from a limitations period that begins even before the plaintiff learns of the harm.

19

1281 (3d Cir. 1991); see also Beauty Time, Inc. v. VU Skin

Systems, Inc., 118 F.3d 140, 144-47 (3d Cir. 1997).

Though the Third Circuit has not applied Holmberg to a claim

for fraud subject to § 2462, those courts that have considered

the question similarly do not require an affirmative act of

concealment separate from the self-concealing fraud, but instead

require only a showing of due diligence on the part of the

plaintiff.  Judge Easterbrook, writing for the Seventh Circuit,

explained:

> We need not decide when a "claim accrues" for the
> purpose of § 2462 generally, because the nineteenth
> century recognized a special rule for fraud, a
> concealed wrong. See, e.g., Bailey v. Glover, 88
> U.S. (21 Wall.) 342 [] (1874); Holmberg v.
> Armbrecht, 327 U.S. 392 [] (1946). These days the
> doctrine is apt to be called equitable tolling, see
> Cada v. Baxter Healthcare Corp., 920 F.2d 446 (7th
> Cir. 1990). Whether a court says that a claim for
> fraud accrues only on its discovery (more
> precisely, when it could have been discovered by a
> person exercising reasonable diligence) or instead
> says that the claim accrues with the wrong, but
> that the statute of limitations is tolled until the
> fraud's discovery, is unimportant in practice.
> Either way, a victim of fraud has the full time
> from the date that the wrong came to light, or
> would have done had diligence been employed. And
> the United States is entitled to the benefit of
> this rule even when it sues to enforce laws that
> protect the citizenry from fraud, but is not itself
> a victim. Exploration Co. v. United States, 247
> U.S. 435 [] (1918).

SEC v. Koenig, 557 F.3d 736, 739 (7th Cir. 2009); see Federal

Election Comm'n v. Williams, 104 F.3d 237, 240-41 (9th Cir. 1996)

(tolling of § 2462 under Holmberg requires "fraudulent conduct by

the defendant resulting in concealment of the operative facts,

failure of the plaintiff to discover the operative facts that are the basis of its cause of action within the limitations period, and due diligence by the plaintiff until discovery of those facts"); see also Cook v. Avien, Inc., 573 F.2d 685, 695 (1st Cir. 1978) ("Even without affirmative acts on the part of defendants, then, a federal cause of action will accrue at the time when plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains.")

Defendant Kearns first responds to the Holmberg doctrine by pointing to 3M Co. (Minnesota Mining and Mfg.) v. Browner, 17 F.3d 1453, 1461 (D.C. Cir. 1994), where the Court of Appeals for the District of Columbia found that § 2462 accrues when the violation occurs, not when it is discovered, and further stated that "[a]n agency's failure to detect violations, for whatever reasons, does not avoid the problems of faded memories, lost witnesses and discarded documents in penalty actions brought decades after alleged violations are finally discovered." 3M Co. did not, however, address the Holmberg doctrine or equitable tolling in fraud cases, because 3M Co. did not involve a claim of fraud but instead arose out of the defendant's "unwitting[]" violations of the Toxic Substances Control Act. 17 F.3d at 1454. Thus it makes sense that an agency's incompetence at enforcing a statute should not justify delay in accrual or lead to tolling. But as the Ninth Circuit points out, 3M Co. is "silent" on the

21

application of Holmberg to cases of fraud and so 3M Co. does not shield defendant from Holmberg.  Federal Election Comm'n, 104 F.3d at 240.

Next, Kearns points to the case law from this circuit that requires affirmative misleading conduct by the defendant distinct from the underlying fraud in order to invoke the tolling doctrine of fraudulent concealment.  See Urcinoli v. Cathel, 546 F.3d 269, 272 (3d Cir. 2008) (equitable tolling of habeas action); Satterfield v. Johnson, 434 F.3d 185, 195 (3d Cir. 2006) (same); Hedges v. United States, 404 F.3d 744, 751 (3d Cir. 2005) (equitable tolling of admiralty claim); In re Unisys Corp. Retiree Medical Benefit ""ERISA'' Litig., 242 F.3d 497, 502 (3d Cir. 2001) (equitable tolling of ERISA claim based in part on allegations of fraud); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1391 n.10 (3d Cir. 1994) (equitable tolling of employment discrimination action).  Of these, only Unisys Corp. arises from a claim sounding in fraud, and consequently only Unisys Corp. addresses the Holmberg/Bailey doctrine.

Unisys Corp., however, involved an ERISA claim subject to the explicitly stated three-year (from date of discovery) and six-year (from date of violation) statute of limitations in Section 1113 of ERISA.  242 F.3d at 502.  Section 1113 includes an express exception "in the case of fraud or concealment," so that "such actions may be commenced not later than six years after the date of discovery of such breach or violation."  29

U.S.C. § 1113.  Consequently, though the appeals court recognized that "the doctrine of equitable tolling can under some circumstances prevent a limitations period from running in favor of a trustee on a breach of fiduciary duty claim even in the absence of concealment on his part," citing Bailey, the Third Circuit found that the doctrine inapplicable to ERISA claims subject to Section 1113.  Unisys Corp., 242 F.3d at 503-04.  Relying heavily on the Supreme Court's decision Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 360-62 (1991), which similarly considered a statute of limitations that included a limitations period based on discovery (one year) and another period based on the date of the violation (three years), the Third Circuit concluded that it would be inconsistent to apply the additional protections of Bailey/Holmberg to a statute of limitations that specifically allotted a limitations period from discovery.  Id.  Instead, the court determined that in order to receive the additional protections of the fraud exception included in the text of Section 1113, a plaintiff must show that the defendant took some affirmative steps to conceal the alleged fraud beyond the concealment inherent in the fraud claim itself.  Id. at 502-04.

    As is evident, the statute of limitations at issue in this case is unlike the statute under consideration in Lampf and Unisys Corp., because § 2462 does not provide for a shorter limitations period based on discovery.  Instead, it is a general

23

limitations period provided by federal statute -- just the sort of limitation to which the Holmberg equitable doctrine would apply.  See Holmberg, 327 U.S. at 396 ("This equitable doctrine is read into every federal statute of limitation").  Though Defendant Kearns maintains that Holmberg should not be applied to a government enforcement action, the Court rejects the position that the government is entitled to less equitable protection from the statute of limitations than a private plaintiff.  See Badaracco v. C.I.R., 464 U.S. 386, 391-92 (1985) ("Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.") (quoting E.I. Dupont de Nemours & Co. v. Davis, 264 U.S. 456, 462 (1924)).  The government's resources, even assuming they are massive as compared to a private person, cannot be unleashed against a fraudulent party until the government is able, with due diligence, to detect the fraud.  The Court will follow the path of the Seventh Circuit and the Ninth Circuit and find that claims bound by the limitations period in § 2462 but sounding in fraud are equitably tolled until the date of discovery, so long as the SEC pursued its claim with due diligence.[8]  See Koenig, 557 F.3d at 739; Williams, 104 F.3d at 240-41.

---

[8] To the extent that In re Community Bank of N. Va., 467 F. Supp. 2d 466, 479 (W.D. Pa. 2006) is inconsistent with this conclusion, the Court respectfully disagrees.  The Court further notes that Community Bank makes no mention of Holmberg or Bailey -- a doctrine that the Third Circuit recognized, but found inapplicable, in Unisys Corp.

Plaintiff has alleged that MedQuist and Defendants reassured auditors that MedQuist had no problems with billing and that the company's increased profits were due to legitimate efforts.  The SEC further alleges that none of the financial filings, prepared by Defendant Van Fossen and signed by Defendant Kearns, revealed the underlying billing scheme.  Finally, the complaint alleges that the scheme was not revealed to the public until March 16, 2004 (at the earliest), within five years of March 12, 2009, the date the SEC brought this complaint.  There is nothing in the Complaint, nor has Defendant Kearns argued, that with due diligence the SEC could have uncovered the fraud prior to March 16, 2004.  These allegations are sufficient to justify the application of Holmberg and to deny Defendants' motion to dismiss on statute of limitations grounds.

Moreover, the Court finds that the SEC has alleged with sufficient particularity that Defendant Kearns actively concealed the fraudulent billing scheme through March 2004 and that such concealment delaying the exposure of the fraudulent scheme, thereby lulling the SEC into sitting on its rights and calling for equitable tolling until, at least, March 16th.  See Oshiver, 38 F.3d at 1389 ("To allow a defendant to benefit from the statute of limitations defense after intentionally misleading the plaintiff with regard to the cause of action, thereby causing the plaintiff's tardiness, would be 'manifestly unjust.'").  The complaint states that after December 2003 and through March 2004,

25

Kearns was a principal source of information for investigating auditors (the primary means for public disclosure) and yet he affirmatively misrepresented to the auditors that there was no such billing scheme.  (Compl. ¶ 71.)  While it is true that the SEC has not alleged the specific date(s) of such misrepresentations, the SEC has alleged the who (Kearns to auditors), what (specific misrepresentations that there was no fraudulent billing scheme), and why (to conceal the billing scheme).  The SEC has further alleged that only on March 16, 2004 did MedQuist disclose that there was an allegation of fraud by an employee and that MedQuist did not publicly disclose its fraudulent scheme until July and August of 2004.  (Id. ¶ 23.) These allegations are sufficient to permit tolling for fraudulent concealment.

The Court rejects Kearns' suggestion that in order to successfully and sufficiently plead fraudulent concealment, the SEC was required to plead that Kearns made these affirmative misrepresentations on March 13, 2004.  The SEC has alleged that Kearns made affirmative misrepresentations to external auditors during the period between December 2003 and March 2004, has leant some measure of substantiation to such allegations by alleging that March 16, 2004 was the first time that MedQuist made any public disclosure of even an allegation of fraudulent billing practices, and so has plead fraudulent concealment with sufficient particularity to satisfy Rule 9(b), Fed. R. Civ. P.

See In re Elec. Carbon Products Antitrust Litig., 333 F. Supp. 2d
303, 316 (D.N.J. 2004) (plaintiff's allegations of affirmative
misrepresentations during a period of time, including an
allegation that the period ended on a specific date with the
defendants' ultimate disclosure of the conspiracy, were
sufficiently particular to plead tolling of that period for
fraudulent concealment).  Consequently, even if Holmberg did not
apply to the SEC's claims, this action is not barred by the
statute of limitations.

## C.   Sufficiency of the Allegations on the Merits

Defendant Kearns asks the Court to dismiss the SEC's claims
under the antifraud provisions in Section 17(a) of the Securities
Act and Section 10(b) (and Rule 10b-5) of the Exchange Act.
Defendant Kearns argues that the SEC has failed to state a fraud
claim for misrepresentations or omissions because none of his
statements were misleading (creating no duty to disclose the
underlying billing scheme).  The Court will reject Defendant
Kearns' arguments, except as they relate to statements of
"puffery" made in investor quarterly meetings and repeated in
Forms 8-K, as now discussed.

To a certain extent, the elements of a claim under Section
10(b), Rule 10b-5, and Section 17(a), are well-established.

> To establish a violation of Section 10(b) and Rule
> 10b-5, the SEC must plead facts demonstrating that
> the defendant: (1) made a misrepresentation, or an
> omission (where there was a duty to speak), or
> other fraudulent device; (2) that was material in
> the case of a misrepresentation or omission; (3) in

27

connection with the purchase or sale of a security;
(4) where the defendant acted with scienter; and
(5) the involvement of interstate commerce, the
mails or a national securities exchange. SEC v.
Adoni, 60 F. Supp. 2d 401, 405 (D.N.J. 1999).
Unlike a private litigant, however, the SEC need
not prove either reliance or damages. GFL
Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 206
n. 6 (3d Cir. 2001); United States v. Haddy, 134
F.3d 542, 549 (3d Cir. 1998).

SEC v. Lucent Technologies, Inc., 363 F. Supp. 2d 708, 714

(D.N.J. 2004) ("Lucent I").  The elements of a Section 17(a)

claim mirror a claim under Section 10(b), Pasternak, 561 F. Supp.

2d at 498 (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450,

1467 (2d Cir. 1996)), except that Section 17(a)(2) and (3) do not

require proof of scienter, First Jersey Sec., 101 F.3d at 1467,

and Section 17(a)(2) requires showing that the defendant obtained

property through his misconduct, 15 U.S.C. § 77q(a)(2).

    Though a private plaintiff may not pursue a claim for aiding

and abetting violations of securities law, Central Bank of

Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S.

164 (1994), Section 20(e) of the Exchange Act states that a

person who "knowingly provides substantial assistance" to another

in violating the Exchange Act is liable "to the same extent as

the person to whom such assistance is provided."  15 U.S.C. §

78t(e).  "To sustain a charge of aiding and abetting, the

plaintiffs have the burden of establishing: (1) that there has

been a commission of a wrongful act an underlying securities

violation; (2) that the alleged aider-abettor had knowledge of

that act; and (3) that the aider-abettor knowingly and

substantially participated in the wrongdoing." <u>Monsen v.</u>
<u>Consolidated Dressed Beef Co., Inc.</u>, 579 F.2d 793, 799 (3d Cir.
1978); <u>SEC v. Lucent Technologies, Inc.</u>, 610 F. Supp. 2d 342, 361
(D.N.J. 2009) ("<u>Lucent IV</u>").

     1.  <u>Misrepresentations to Public</u>

As previously noted, Defendant Kearns argues that none of
his statements to the shareholders or the public[9] were

---

[9] Left unaddressed by the parties, is whether Defendant
Kearns' alleged misrepresentations and omissions to MedQuist
auditors, on their own, are sufficient for Section 10(b) and
Section 17(a) liability.  This is not insignificant because the
SEC alleges that Kearns affirmatively misled auditors regarding
MedQuist's billing practices, failed control mechanisms, and
allegations of fraud.  (Compl. ¶¶ 62-69.)  Defendant assumes that
the only alleged misrepresentations at issue under Section 10(b)
and Section 17(a) are those statements (and alleged improper
omissions) made to shareholders and the public.  The SEC does not
directly respond to this assumption, instead asserting generally
that Defendant Kearns' conduct in concealing the billing scheme
from auditors "contributed to the delay in public disclosure of
the fraudulent billing scheme . . . ."  (Pl. Kearns Opp'n at 24).
It appears, then, that the SEC considers Kearns
misrepresentations to auditors to be part of the alleged
"fraudulent device" -- the billing fraud scheme -- and not an
independent basis for liability for misrepresentations or
omissions under Section 10(b) and Section 17(a).  In order words,
it appears the SEC is alleging that Kearns is liable both for his
misrepresentations to the public and for his participation in a
fraudulent scheme to increase revenue (a scheme which included
deceiving the auditors), in connection with the sale of
securities.
    It may be that the SEC would not seek to hold Defendant
independently liable under Section 10(b) and Section 17(a) for
misrepresentations to auditors (as opposed to misrepresentations
made to shareholders and the public), because of the requirement
that the misrepresentations be made "in connection with the
purchase or sale of a security."  <u>See</u> 15 U.S.C. § 78j(b); <u>see</u>
<u>also</u> 15 U.S.C. § 77q(a) ("It shall be unlawful for any person in
the offer or sale of any securities . . .").  However, some
courts have noted,

misleading, and that Defendant Kearns consequently had no duty to reveal MedQuist's billing scheme designed to inflate revenue, so that no liability attaches.  For the reasons laid out below, the Court rejects this argument as it relates to Kearns' statements regarding "contracted rates" and describing specific sources of revenue in the MD&A section of MedQuist's Forms 10-K and 10-Q, as well as forms S-8, S-3, and S-3A.  However, the Court accepts Defendant Kearns' argument as it relates to Kearns' vaguely positive statements made in the quarterly investor conferences and Form 8-K.

    First, Kearns argues that some of his statements were

---

        There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach.  SEC v. Holschuh, 694 F.2d 130, 142 (7th Cir. 1982) ("actual or first-hand contact with offerees or buyers [is not] a condition precedent to primary liability for antifraud violations").  Nevertheless, for an accountant's misrepresentation to be actionable as a primary violation, there must be a showing that he knew or should have known that his representation would be communicated to investors because § 10(b) and Rule 10b-5 focus on fraud made "in connection with the sale or purchase" of a security.

Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226-27 (10th Cir. 1996); see Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (quoting Anixter).  This is usually raised in the debate over the distinction between primary liability and aiding and abetting, with courts diverging over whether the statements must be publicly attributed to the speaker when they are ultimately conveyed to the public.  The question of whether Kearns' statements to auditors are enough for liability for misrepresentations (rather than for a fraudulent scheme) to attach is not squarely presented in this motion and need not be decided here.

objectively true.  Specifically, Kearns argues that his
representation that MedQuist's revenue was based on "contracted
rates" was correct, because the term "is common parlance in the
medical transcription business and means that MedQuist did not
charge a company-wide standard rate, but instead that customers'
line rates varied with the terms of individual client contracts."
(Def. Kearn's Br. at 29.)  Kearns also maintains that his
representation that increased revenues where due to "increased
sales to existing customers, sales to new customers and strategic
partners, and additional revenue from acquisitions" is accurate
because, according to Kearns, this "merely attributes some
revenue . . . to [MedQuist's] existing transcription services and
other revenue to services provided by new acquisitions."  (Def.
Kearn's Br. at 30-31.)

    The question of whether these statements are accurate,
however, raises a disputed issue of fact that should not be
decided on this motion to dismiss.  See Tracinda Corp. v.
DaimlerChrysler AG, 502 F.3d 212, 229 (3d Cir. 2007) ("Whether
any particular representation . . . was false or misleading [for
the purposes of securities fraud] is a question of fact subject
to review under the clearly erroneous standard.") (citing Healey
v. Chelsea Res., Ltd., 947 F.2d 611, 618 (2d Cir. 1991) ("Matters
of misrepresentation, knowledge, reliance, causation, and
scienter are questions of fact, and the trial court's findings as
to those facts may not be set aside unless they are clearly

erroneous."))  The SEC alleges that "contracted rates" is misleading because MedQuist was not actually billing as required by its contracts.  Defendant Kearns' assertion that "contracted rates" has a different meaning "in common parlance" and so would not be misleading as a matter of law is, in fact, a factual question that should not be resolved here.

Similarly, Kearns' argument that attributing increased revenue to "increased sales to existing customers" and other specific legitimate sources, without revealing that revenues were also from a fraudulent billing scheme, is not misleading because it merely attributes some revenue to existing customers is only one possible characterization of the statements made.  While it is true that "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information," Oran v. Stafford, 226 F.3d 275, 285 (3d Cir. 2000), there is a "duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading."  Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 (3d Cir. 1989).[10]  A reasonable fact-finder could find it

_____

[10] Defendant does not suggest that the underlying fraudulent billing scheme was not material information.  "Generally, undisclosed information is considered material if there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor."  Oran, 226 F.3d at 282 (internal quotations omitted).  The Court has no trouble finding that information about a fraudulent billing scheme to inflate revenue would have significantly altered the

misleading to attribute increased revenue to increased sales to existing customers when, in fact, MedQuist's revenues were also due to falsely inflating bills to existing customers and not merely increased sales to those customers.  See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281-82 (3d Cir. 1992) (when defendant affirmatively characterizes management practices as, for example, "adequate," "conservative," "cautious," and the like, "the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations"); Steiner v. MedQuist Inc., No. 04-5487, 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (finding similar statements to have "put the source of MedQuist's revenue at issue and, therefore, the Company's failure to disclose a major source of that revenue -- the improper billing scheme -- was misleading.")  Thus, the Court cannot declare as a matter of law that these statements were not misleading to potential investors.

By contrast, Kearns' second argument addressing statements Kearns made at the quarterly investor meetings and then again through MedQuist's Forms 8-K is more persuasive.  These statements, attributing MedQuist's success to "back to basics management discipline," "disciplined business practice," and the experience and discipline of its management team, are mere "puffery" and cannot give rise to a duty to disclose.  "[V]ague

---

"total mix" of information for an investor, in the absence of any argument to the contrary by Defendant.

and general statements of optimism 'constitute no more than
puffery and are understood by reasonable investors as such.'"  In
re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999)
(quoting Burlington Coat, 114 F.3d at 1428 n.14.).  "Such
statements, even if arguably misleading, do not give rise to a
federal securities claim because they are not material: there is
no 'substantial likelihood that the disclosure of the omitted
fact would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made
available.'" Id. at 538-39 (quoting TSC Indus., Inc. v. Northway,
Inc., 426 U.S. 438, 449 (1976)).  The vague and general
statements about management discipline given at the quarterly
meetings are just the sort of puffery that cannot form the basis
of liability, because no reasonable investor would have relied on
them.[11]  See Galati v. Commerce Bancorp, Inc., 220 F. App'x 97,
102 (3d Cir. 2007) (statements about company's "dramatic deposit
growth," "strong performance," and "unique business model" were
mere puffery and consequently did not give rise to a duty to
disclose malfeasance by senior officers).  Consequently, the

---

[11] Contrary to the SEC's suggestion, the breach of a
fiduciary duty, alone, is not the basis for a securities fraud
claim under Section 10(b) and Section 17(a).  Craftmatic, 890
F.2d at 639 ("The violation of federal law stems from the
substantial likelihood that disclosure would have been viewed by
the reasonable investor as having significantly altered the
'total mix' of information available, not from a determination
that an undisclosed act constitutes a breach of fiduciary duty or
that a transaction was unfair to investors.") (internal citations
omitted).

Court will grant Defendant Kearns' motion to dismiss only as it relates to his statements at the quarterly meetings and in Form 8-K, as reflected in paragraphs 76 and 77 of the complaint.

    2.   Fraudulent Scheme

    Defendant Kearns does not address, either in his motion to dismiss or his reply, the SEC's argument regarding scheme liability.  The SEC, relying on the language of Section 10(b) and the Supreme Court's decision in Stoneridge Inv. Partners, LLC. v. Scientific Atlanta, Inc., 552 U.S. 148, 158 (2008) among others, points out that liability under Section 10(b) and Rule 10b-5 attaches not only to misleading statements to the public, but to deceptive practices.  In Stoneridge, the Supreme Court rejected the position that securities fraud claims can only be based on oral or written statements to investors, confirming that "[c]onduct itself can be erroneous."  552 U.S. at 158.[12] Consequently, within this circuit, courts have recognized a claim for scheme liability where the SEC alleges "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter[.]" Lucent IV, 610 F. Supp. 2d at 350; see Steiner, 2006 WL 2827740, at *21-22 (recognizing scheme liability under Rule

_____

    [12] The Stoneridge court ultimately rejected the investors' claim, because it found that the investors had failed to show that they in fact relied on the defendant's deceptive acts.  552 U.S. at 159-60.  As previously noted, the SEC is not obligated to establish actual investor reliance to prevail.  Lucent IV, 610 F. Supp. 2d at 350.

10b-5).

The SEC alleges that Defendant Kearns engaged in inherently deceptive conduct, separate and apart from his direct statements to the public, designed to secretly and artificially inflate MedQuist's revenues.  Specifically, the SEC alleges that Kearns knew of the fraudulent billing scheme and repeatedly discussed the scheme with its chief architects at the FOPA, permitted the scheme to continue by implementing inadequate investigations when claims of fraud were made, and, most importantly, affirmatively misled MedQuist auditors by assuring them that there were no allegations of fraud, that there were no billing irregularities, and that the auditors had received all relevant information.  These allegations are sufficient to show that Defendant Kearns intentionally engaged in a fraudulent scheme to increase revenues and defraud investors.  The SEC has sufficiently alleged that Kearns violated Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act through a fraudulent device.

## III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendant Kearns' motion to dismiss.  The Court finds that the SEC has timely brought its claims against Kearns and has stated valid claims under the antifraud provisions in Section 17(a) of the Securities Act and Section 10(b) (and Rule 10b-5) of the Exchange Act, except as to any claims for misrepresentations arising out of Kearns' statements, made during

investor quarterly meetings and repeated in MedQuist's Form 8-K, attributing MedQuist's success to "back to basics management discipline," "disciplined business practice," and the experience and discipline of its management team, which the Court finds to be inactionable "puffery."

The accompanying Order shall be entered.


__February 23, 2010__         __s/ Jerome B. Simandle__
Date                           JEROME B. SIMANDLE
                                   United States District Judge